UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              :
**UNITED STATES OF AMERICA**,                                 :
                                                              :
              – against –                                     :  **MEMORANDUM DECISION AND**
                                                                 **ORDER**
                                                              :
**MARTIAL H. AMILCAR**, **et al.**,                           :  23-CR-18 (AMD)
                                                              :
                              Defendants.                     :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

Before the Court are Bradley Augustin's and Rick Jasmin's motions to suppress

statements they made to law enforcement agents, as well as evidence from Jasmin's social media

accounts and cellphones.  In the alternative, the defendants request evidentiary hearings on these

motions.  For the following reasons, the defendants' motions are denied.

## BACKGROUND

### I.     The Superseding Indictment

On May 9, 2024, a grand jury returned a superseding indictment charging Bradley

Augustin, Rick Jasmin, and six other individuals with racketeering, in violation of 18 U.S.C. §

1962(c).  (ECF No. 46.)[1]  The defendants are alleged to be members of the Hyena Crips, a

Brooklyn-based street gang whose criminal activities include "murder, assault, robbery, drug

trafficking, bank fraud, access device offenses and other crimes."  (*Id.* ¶ 1.)

The superseding indictment charges Augustin with participating in two of the enumerated

predicate acts: the June 19, 2020, robbery of a Caribbean Airmail store located in Queens and the

---

[1] The indictment also charges Augustin's and Jasmin's co-defendants — Martial H. Amilcar and ████ — with murder.  (ECF No. 46 ¶¶ 23–26.)  On March 20, 2025, Amilcar pled guilty to the racketeering charge.  (*Minute Entry dated Mar. 20, 2025.*) ████████████

September 20, 2020, murder of Roodson Polynice. (*Id.* ¶¶ 17, 20–22 (Predicates Acts 9, 12).)
Jasmin is charged with participating in three predicate acts: the September 3, 2012, murder of
Leandre Mallinckrodt; the May 23, 2020, attempted murder of John Doe #1; and conspiring to
commit identify theft to obtain unemployment insurance benefits between March 2020 and
March 2021. (*Id.* ¶¶ 9, 12–13 (Predicates Acts 1, 4–5).)

## II.    Bradley Augustin

In December 2014, Augustin, a Haitian national, was admitted to the United States as a
lawful permanent resident. (ECF No. 171 at 15.) He was fifteen years old. (*Id.*)

On January 20, 2021, police officers arrested Augustin near Harrisburg, Pennsylvania,
after they stopped the car in which he was a passenger. (*Id.*) The officers found a gun and
marijuana in the car and charged Augustin with carrying a firearm without a license, in violation
of 18 Pa. Cons. Stat. § 6106(A)(1), possession of marijuana (personal use), in violation of 35 Pa.
Cons. Stat. § 780-113(A)(31)(I), and use or possession of drug paraphernalia, in violation of 35
Pa. Cons. Stat. § 780-113(A)(32). (*Id.*) On February 20, 2021, while the first case was pending,
police arrested Augustin for driving under the influence of a controlled substance, in violation of
75 Pa. Cons. Stat. § 3802(0)(1)(i). (*Id.*)

On September 8, 2021, Augustin pled guilty in the Dauphin County Court of Common
Pleas to the three charges stemming from the January 2021 arrest (*id.*; ECF No. 159 at 2 n.1),
and was sentenced to six months' probation (ECF No. 171 at 15). Augustin also pled guilty in
the Cumberland County Court of Common Pleas to driving under the influence, in violation of
75 Pa. Cons .Stat. § 3802(A)(1), in connection with the February 2021 arrest. (*Id.* at 16.)

In a November 2, 2021 email, an United States Immigration and Customs Enforcement
("ICE") officer informed a U.S. Department of Homeland Security Investigations ("HSI") agent

that ICE was "waiting to hear back from Dauphin County probation about coordinating a pick up for" Augustin for removal proceedings, based on his Pennsylvania firearm conviction.  (ECF No. 171-1 at 2 (Gov. Ex. A); *see also* ECF No. 159-1 at 3 (Augustin Ex. A).)  On December 14, 2021, ICE issued Augustin a Notice to Appear.  (ECF No. 171-2 (Gov. Ex. 2).)  The notice advised Augustin that he was subject to removal from the United States because of his Pennsylvania firearm conviction and that he must appear before an immigration judge on December 21, 2021.  (*Id.* at 2, 5 (Gov. Ex. 2).)  ICE also issued a warrant for his arrest.  (ECF No. 171-3 (Gov. Ex. 3).)  That day, Philadelphia-based ICE officers arrested Augustin while he was meeting with his probation officer in Harrisburg.  (ECF No. 171-4 at 4 (Gov. Ex. 4).)  The officers "identified themselves," and asked Augustin to confirm his identity, which he did.  (*Id.*)  The officers told Augustin that he was "being arrested by ICE for a violation of US Immigration Law," and took him into custody "without incident."  (*Id.*)  They drove Augustin approximately twenty-six miles to a holding facility in York, Pennsylvania (*id.*; *see also* ECF No. 171 at 17), where Augustin was served with the Notice to Appear (ECF No. 171-4 at 4 (Gov. Ex. 4)).  Augustin was ordered detained "pending a final administrative determination."  (ECF No. 171 at 17; ECF No. 171-5 (Gov. Ex. 5).)[2]

Later that day, three HSI agents traveled to York to interview Augustin.  (ECF No. 171 at 17.)  According to an HSI investigation report and one of the officer's contemporaneous handwritten notes, the HSI agents advised Augustin of his constitutional rights, which Augustin "indicated he understood."  (ECF No. 160-1 at (Augustin Ex. 1); *see also* ECF No. 172-6 (Gov.

---

[2] Augustin did not acknowledge receipt of this custody order, nor did he request review of the custody determination.  (ECF No. 171-5 (Gov. Ex. 5).)

Ex. 6).)[3]  Augustin agreed to speak with the HSI agents, who conducted the interview in English. (ECF No. 171 at 18.)  Augustin described the circumstances of his January 2021 arrest, and his relationship with alleged members of the Hyena Crips, as well as details about vehicles and locations in Brooklyn.  (ECF No. 160-1 at 3 (Augustin Ex. A).)  Augustin said that he "[did] not know what a Hyena is and denied being a gang member."  (*Id.*)

About four months later, on April 19, 2022, an immigration judge granted Augustin's motion to terminate the removal proceedings.  (ECF No. 171-7 at 4 (Gov. Ex. 7).)  The judge wrote that the "Board of Immigration Appeals previously addressed the issue whether the pertinent statute" — Augustin's state firearms conviction under 18 Pa. Cons. Stat. § 6106(A)(1) — was "categorically a firearms offense" under federal law.  (*Id.*)  Because "Pennsylvania's definition of a 'firearm' does not exclude antique firearms," the firearms offense of which Augustin was convicted is "not categorically" a match with the federal definition and therefore could not be the basis for removal.  (*Id.* at 4–5.)

Augustin was arrested for this case just over two years later, on May 15, 2024, in Pennsylvania.  (ECF No. 57.)

## III.    Rick Jasmin

### a.    December 2020 Social Media Warrant

On December 28, 2020, Magistrate Judge Cheryl Pollak signed a warrant authorizing the government to search sixteen social media accounts, including Jasmin's Facebook account ("Subject Account-13") and Instagram account ("Subject Account-15"),[4]  for "fruits, evidence,

---

[3] Augustin asserts that "the Government has not produced any evidence documenting the waiver of" his constitutional rights.  (ECF No. 159 at 3.)

[4] Subject Account-15 and the other subject Instagram accounts are "stored at premises owned, maintained, controlled, and operated by Facebook Inc."  (ECF No. 162-2 at 12 (Jasmin Ex. A).)

and instrumentalities" of federal offenses.  (ECF No. 162-2 at 7, 15 (Jasmin Ex. A).)[5]  In a

supporting affidavit, James Grzelak, a Task Force Officer ("TFO") with the New York Police

Department and HSI, described the Hyena Crips and its violent criminal activity.  (*Id.* at 26–27.)

Grzelak also explained that police recovered a cell phone in connection with a carjacking; the

cellphone contained "evidence that multiple members of the Hyena Crips participated in a

Facebook audio call on June 6, 2020 in which they discussed the rules and structure of the Hyena

Crips and the Gang's criminal activities."  (ECF No. 172 at 22 (citing ECF No. 162-2 at 29–35

(Jasmin Ex. A)).)  Jasmin was not on that call.  (ECF No. 162 at 9; ECF No. 171 at 22.)

In addition, on May 23, 2020, a co-defendant sent the following text message to another

gang member: "Yo Hyens Tell Jab to Come Back With the Jawn."  (ECF No. 162-2 at 39

(Jasmin Ex. A).)  Grzelak affirmed that, based on his training and experience, "Jab" referred to

Jasmin, and "jawn" meant gun.  (*Id.* at 39, 57.)  Jasmin shot John Doe #1 minutes after the

message was sent.  (*Id.* at 57–58.)  Police officers subsequently arrested Jasmin for the shooting.

(*Id.* at 58.)

Grzelak cited the following facts as probable cause for searching the Facebook and

Instagram accounts.  Jasmin "repeatedly displayed" a "bluish/purple emoji with horns" in his

Facebook posts, which Grzelak said was "a reference to the Hyena Crips gang."  (*Id.* at 56.)

Jasmin also posted "image[s] stating" that the "job[s] he was born for" were "Gang Leader" and

"weapons dealer."  (*Id.* at 57.)  Jasmin's Instagram account used the same emojis and included

---

[5] The subject offenses included 18 U.S.C. §§ 1962 (racketeering and racketeering conspiracy), 1951 (Hobbs Act robbery), 2119 (carjacking), 922(g) (felon in possession of a firearm), 924(c) (illegal possession of firearms during and in relation to crimes of violence), 1343 and 1349 (wire fraud conspiracy), as well as 21 U.S.C. § 841 (possession with intent to distribute controlled substances). (ECF No. 162-2 at 7–8, 15.)

photographs of guns and of Jasmin posing "with his index finger and pinky finger extended," a sign "used by members of the Hyena Crips." (*Id.* at 61.)

The warrant directed Facebook and Instagram to disclose "[a]ll contact and personal identifying information," "activity logs," posts, photos and videos uploaded by the account user, photos and videos in which the user is tagged, "profile information," "stored communications," location information, IP logs, content that the user has "liked," friends lists, searches, use of Facebook Marketplace, and privacy settings. (*Id.* at 6–7, 13–15.)[6] There were time limitations

---

[6] For Subject Account-13, the warrant directed Facebook to disclose:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail address, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers; (b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities; (c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them; (d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected 'Friend' requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications; (e) All stored communications, including public messages, private messages, group messages, direct shares, stories, chat history, video calls, audio calls, made or received by the user, chat history, video calling history, and pending 'Friend' requests; (f) All 'check ins' and other location information; (g) All IP logs, including all records of the IP addresses that logged into the account; (h) All records of the Account's usage of the 'Like' feature, including all Facebook posts and all non-Facebook webpages and content that the user has 'liked'; (i) All information about the Facebook pages that the account is or was a 'fan' of; (j) All past and present lists of friends created by the account; (k) All records of Facebook searches performed by the account; (l) All information about the user's access and use of Facebook Marketplace; (m) The types of service utilized by the user; (n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number); (o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and (p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

for both accounts — from December 1, 2018 through the date of the warrant for Subject Account-13 and from March 3, 2019 through the date of the warrant for Subject Account-15. (*Id.* at 4–7, 12–15; *see also* ECF No. 171 at 23.)  The warrant limited the seizure to information related to the subject offenses involving the 16 named individuals.  (ECF No. 162-2 at 7–9, 15–16 (Jasmin Ex. A).)

     **b.**    **January 2021 LG Phone Warrant**

On December 2, 2020, police officers arrested Jasmin for shooting John Doe #1 and seized Jasmin's LG cellphone.  (ECF No. 171 at 24.)  On January 14, 2021, then-Magistrate Judge Sanket Bulsara[7] signed a warrant authorizing a search of the LG phone for evidence relating to the same offenses listed in the December 2020 warrant.  (ECF No. 162-4 at 2, 5 (Jasmin Ex. C).)  In his affidavit in support of the warrant, Grzelak asserted that Jasmin's social media accounts — Subject Account-13 and Subject Account-15 — contained evidence "of his membership and criminal activity" with the Hyena Crips.  (*Id.* at 12.)  Additionally, the affidavit cited evidence attributing the Doe shooting to Jasmin, including social media messages and videos connecting him to the crime.  (*Id.* at 13.)

The affidavit also cited "publicly accessible images and content posted to [Jasmin's other] Facebook account," including a December 28, 2020 post in which Jasmin wrote about the "Reason I shoot that boy," and a video in which someone said to Jasmin, "[S]omeone said you shot that nigga in the face."  (*Id.* at 15.)  Jasmin also spoke about a witness who saw him shoot the victim, saying he would "get next to that bitch" and "tell her to do the right thing" or he would "have the dogs do it."  (*Id.*)

---

The warrant directed Facebook to disclose identical information from Subject Account-15.  (ECF No. 162-2 at 5–6 (Jasmin Ex. A).)

[7] Judge Bulsara received his commission as a United States District Judge on December 20, 2024.

### c.    March 2021 Samsung Phone 1 Warrant and Statements to Law Enforcement

On March 20, 2021, Jasmin was shot in the neck and taken to Kings County Hospital, where hospital staff took and stored Jasmin's belongings, including a Samsung cellphone ("Samsung Phone 1"). (ECF No. 162 at 17; ECF No. 171 at 19, 25.) That same day, a grand jury in this district issued a subpoena to Kings County Hospital for Samsung Phone 1. (ECF No. 171-11 (Gov. Ex. 11).)

On March 21, 2020, Jasmin was transported to Bellevue Hospital so doctors could determine whether he needed additional surgery. (ECF No. 171 at 19.) NYPD officers interviewed Jasmin, who agreed to speak with them. (ECF No. 171-8 at 3 (Gov. Ex. 8).)[8] He said "in sum and substance that he was hanging out having a drink" when "[u]nidentified people from the neighborhood" came up and shot him. (*Id.*) Jasmin went back to Kings County Hospital later that day. (ECF No. 171 at 19.)

Hospital personnel gave Samsung Phone 1 to law enforcement on March 22nd. (ECF No. 162-3 at 19 (Jasmin Ex. B); ECF No. 171 at 25; ECF No. 171-11 (Gov. Ex. 11).) Thereafter, Grzelak applied for a warrant to search the phone. (ECF No. 162-3 at 9 (Jasmin Ex. B).) He asserted in the supporting affidavit that Jasmin's Facebook and Instagram accounts "included photographs, videos, and messages indicating [that Jasmin] has sold controlled substances and possessed firearms." (*Id.* at 14.)[9] The affidavit also cited evidence that Jasmin was responsible for the Doe shooting, including Jasmin's December 28, 2020 Facebook posts, cited above, in which Jasmin commented about a witness to the shooting. (*Id.* at 15–18.) Additionally, on

---

[8] Jasmin was "heavily medicated." (ECF No. 171-8 at 3 (Gov. Ex. 8).)

[9] This evidence included a photograph of Jasmin "holding and smelling" marijuana, videos of Jasmin holding weapons, including firearms, and smoking marijuana, and a message exchange in which a person with the username "Stain Blixk" called Jasmin a "rat" and told him "u gonna die," to which Jasmin responded, "U GOT A GUN ME TOO." (ECF No. 162-3 at 14 (Jasmin Ex. B).)

March 20, 2021 — the day that Jasmin was shot — Jasmin posted a photo of an AR-15 with the caption "need that;" he also wrote, "[N]ext niggas I see pull by house this summer fire on them," which Grzelak said was a threat to "shoot other people who go near his house." (*Id.* at 20.)[10] On March 24, 2021, Judge Pollak signed a warrant authorizing law enforcement to search Samsung Phone 1 for "evidence, fruits, and instrumentalities" relating to the same offenses listed in the December 2020 and January 2021 warrants. (*Id.* at 2, 5, 8; *see also* ECF No. 162 at 17; ECF No. 171 at 25.) The warrant was limited to the period starting on December 1, 2018, and ending on March 22, 2021. (ECF No. 162-3 at 5 (Jasmin Ex. B).)

On March 25, 2021, Grzelak, TFO William Dooley and Special Agent Kyle Tallio interviewed Jasmin at Kings County Hospital. (ECF No. 172-9 at 3 (Gov. Ex. 9); *see also* ECF No. 162 at 27.)[11] They did not advise Jasmin of his constitutional rights "because Jasmin was a victim, and the agents did not intend to elicit incriminating information." (ECF No. 171 at 19–20.) Jasmin told the agents about the March 20, 2021 shooting, including his belief that the gang sanctioned the attack, and that his assailants shot him to gain "clout" in the Hyena Crips. (ECF No. 172-9 at 3–4 (Gov. Ex. 9).) Jasmin explained that attack was approved because other gang members were jealous of his "stature within the Hyena gang." (*Id.* at 4.) Jasmin told the agents that another gang member murdered Samuel Joseph in 2019, and that someone gave Jasmin the gun that killed Joseph. (*Id.* at 5.)

In a sworn affidavit, Jasmin asserts that ████████████████ ████████████████████████████ (ECF No. 163-6 at 3 (Jasmin Ex. E).) █

---

[10] In social media posts from the days leading up to the shooting, Jasmin posted that he had been "on the run for six months," that rival gangs were "going to be injured," and that the founder of the "Gangster Disciples," street gang should be freed. (ECF No. 162-3 at 20–21 at 9 (Jasmin Ex. B).)

[11] Jasmin states that the interview took place on March 24, 2021. (ECF No. 163-6 at 2 (Jasmin Ex. E).)

9



(*Id.* at 2–3.)

(*Id.*)

(*Id.*)

(*Id.* at 3.)

(*Id.*)

At the end of the interview, the agents gave Jasmin a blank financial affidavit for CJA counsel, which Jasmin completed.  (ECF No. 171 at 21; ECF No. 171-10 (Gov. Ex. 10).)

(ECF No. 171 at 21.)

(*Id.*)

### d.    April 2021 Samsung Phones 2 and 3 Warrant

Law enforcement officers seized two additional Samsung cellphones in March and April 2021.  Police found the first phone ("Samsung Phone 2") on March 20, 2021, where Jasmin said he dropped it, underneath a parked car close to where he was shot.  (ECF 162 at 22; ECF No. 171 at 26.)  Police seized the other phone ("Samsung Phone 3"), which Jasmin was carrying, after they arrested him on April 9, 2021 for violating his bail conditions.  (ECF No. 171 at 26.)[12]

---

[12] Jasmin was arrested on April 2, 2021, and charged with drug distribution, in violation of 21 U.S.C. § 841(a)(1).  (ECF No. 171 at 26)  Magistrate Judge Lois Bloom released Jasmin on bail, with the condition that he not post on social media.  (*Id.*)  When Jasmin continued to post on his publicly accessible Instagram account — Subject Account-15 — Judge Bloom revoked his bail.  (*Id.*)

In his supporting affidavit for a search warrant, Grzelak cited the same information in the supporting affidavits for the December 2020, January 2021, and March 2021 warrants.  (ECF No. 162-5 at 15–25 (Jasmin Ex. D).)  In addition, Grzelak stated that Samsung Phone 1 had evidence that Jasmin put in fraudulent claims for uninsurance benefits.  (*Id.* at 22–23.)  Finally, Grzelak cited Jasmin's social media posts from April 6, 7, and 8, 2021, while he was free on bail.  (*Id.* at 25–27.)[13]

On April 23, 2021,[14] Magistrate Judge Robert Levy signed a warrant authorizing law enforcement to search the Samsung cellphones for "evidence, fruits, and instrumentalities" of the offenses listed in the December 2020, January 2021, and March 2021 warrants, as well as evidence of mail fraud and mail fraud conspiracy, wire fraud and wire fraud conspiracy, access device fraud, and aggravated identity theft.  (ECF No. 162-5 at 5–6 (Jasmin Ex. D); ECF No. 171 at 26.)[15]

## LEGAL STANDARD

### I.    Fourth Amendment

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  Thus, "a warrant may not be issued

---

[13] Jasmin's posts included rap lyrics and text exchanges with other individuals that "seem[ed] to advocate additional violence . . . against those who shot him on March 20, 2021," among other posts.  (ECF No. 162-5 at 25–27 (Jasmin Ex. D).)

[14] The warrant is undated, but the government represents that Judge Levy signed it on April 23, 2022.  (*See* ECF No. 162-5 at 2 (Jasmin Ex. D); ECF No. 171 at 26.)

[15] These offenses are 18 U.S.C. §§ 1341 and 1349 (mail fraud and mail fraud conspiracy); 1343 and 1349 (wire fraud and wire fraud conspiracy); 1029 (access device fraud); and 1028A (aggravated identity theft).  (ECF No. 162-5 at 5–6, 15 (Jasmin Ex. D).)

unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he Warrants Clause requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown."). Particularity means that the warrant must "clearly state what is sought;" the overbreadth rule limits the scope of the warrant "'to the probable cause on which the warrant is based.'" *Cioffi*, 668 F. Supp. 2d at 390 (quoting *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006)). Though similar in focus, particularity and overbreadth pose "two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, No. 09-CR-625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010).

A judge deciding whether there is probable cause for a search warrant "must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238). A warrant is sufficiently "particular" if it (1) "identif[ies] the specific offense for which the police have established probable cause," (2) "describe[s] the place to be searched," and (3) "specif[ies] the items to be seized by their relation to designated crimes." *United States*

*v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013). "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Id.* at 446 (citation omitted).

"Despite their frequent conflation, '[over]breadth and particularity are related but distinct concepts.'" *United States v. Shipp*, 392 F. Supp. 3d 300, 307 (E.D.N.Y. 2019) (quoting *United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017), *cert. denied*, 585 U.S. 1033 (2018)). "A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement." *Id.* (quoting *Ulbricht*, 858 F.3d at 102). Similarly, "[w]hen the criminal activity pervades [an] entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *Ulbricht*, 858 F.3d at 102 (citation omitted). "In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'" *Shipp*, 329 F. Supp. 3d at 307 (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013)).

A search or seizure pursuant to a warrant is ordinarily presumed valid. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). "A magistrate's determination of probable cause" — whether probable cause existed to issue the warrant in the first place and whether the scope of the warrant comported with probable cause — "should be paid great deference." *Gates*, 462 U.S. at 236 (citation and quotation marks omitted); *see also United States v. Dupree*, 781 F. Supp. 2d 115, 154 (E.D.N.Y. 2011). That is because the magistrate judge is in the best position to determine whether the underlying affidavit adequately "detailed" the investigation and appropriately "credit[ed] the source of the information." *United States v. Ventresca*, 380 U.S.

13

102, 109 (1965). "The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (cleaned up) (quoting *Gates*, 462 U.S. at 238–39).

## II.    Fifth Amendment

The Fifth Amendment protects a person's right not to incriminate himself. U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). Criminal defendants are entitled to prophylactic warnings advising them of their constitutional rights to protect them "from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "[I]f the individual indicates 'that he wishes to remain silent, the interrogation must cease.'" *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *United States v. Medunjanin*, 752 F.3d 576, 585 (2d Cir. 2014)). The individual "must assert his right affirmatively and unambiguously." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010)). "*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (citation omitted).

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived his . . . rights when making the statement." *O'Brien*, 926 F.3d at 73 (quoting *Berghuis*, 560 U.S. at 382). The waiver "'must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and must be 'knowing[]' in the sense that it was 'made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it.'" *O'Brien*, 926 F.3d at 73 (quoting *Berghuis*, 560

U.S. at 382–83 (emphasis in original)).  The prosecution must prove waiver "by a preponderance of the evidence," and it may be inferred "from all the circumstances."  *Berghuis*, 560 U.S. at 384.

## DISCUSSION

### I.  Bradley Augustin

Augustin moves to suppress the statements he made to law enforcement agents on December 14, 2021.  He claims that those statements were the product of an unlawful arrest in violation of the Fourth Amendment, and that he did not knowingly and voluntarily waive his constitutional rights under the Fifth Amendment.  As explained below, neither argument has merit.

#### a.    Fourth Amendment

According to Augustin, immigration officers arrested him "under the ruse of an immigration proceeding in order to investigate a criminal matter," and the statements he made were the fruit of an illegal arrest.  (ECF No. 159 at 6.)  "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure."  *United States v. Brito*, 771 F. Supp. 3d 157, 166 (E.D.N.Y. 2025) (quoting *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014)).  "Once the defendant has met this burden, the burden shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment."  *Id.* (quoting *Herron*, 18 F. Supp. 3d at 221).

The record shows that ICE agents arrested Augustin pursuant to a valid warrant, in connection with deportation proceedings.  (*See* ECF No. 171-3 (Gov. Ex. 3).)  Augustin, a lawful permanent resident, was convicted on September 8, 2021 of carrying a firearm without a license, in violation of 18 Pa. Cons. Stat. § 6106(A)(1).  (ECF No. 159 at 2 n.1.)  ICE initiated removal proceedings just over a month later, because it determined that Augustin's conviction was a

deportable firearm offense under Section 237(a)(2)(C) of the Immigration and Nationality Act. (ECF No. 171-1 at 5 (Gov. Ex. 1).)  ICE agents identified Augustin "while conducting record checks through the [agency's] indices" on October 19, 2021, and sought supervisory approval for his arrest the next day.  (*Id.* at 3–5.)  HSI had nothing to do with these proceedings, and did not learn of them until November 2, 2021, when ICE agents informed them.  (*Id.* at 2–3); *see United States v. Ventura*, 96 F.4th 496, 503 (2d Cir. 2024) ("[T]he chronology . . . of ICE's presumptively lawful and discretionary decisions to terminate parole, initiate a new removal proceeding, and detain [the defendant] — [did] not itself justify a factual finding of pretext."). This chronology does not support Augustin's claim that the arrest was pretextual.[16]

The fact that Augustin "was subsequently released from immigration detention without removal" does not affect this conclusion.  (ECF No. 159 at 8.).  The "validity of [an] arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *DeFillippo*, 443 U.S. at 36; *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information.").  Under these circumstances, the ultimate disposition — dismissal of the deportation case — is irrelevant to the validity of the arrest.

Augustin's reliance on *United States v. Ventura* is misplaced.  Ventura, charged with illegal re-entry, was released on bail.  *Id.* at 499.  However, ICE officials continued to hold

---

[16] The unpublished October 2020 BIA decision finding the Pennsylvania gun offense is not a deportable offense does not alter this analysis.  (ECF No. 183 at 2.)  It is well established that "police action based on a presumptively valid law [is] subject to a valid defense of good faith."  *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).  Augustin does not claim, and nothing in the record suggests, that the immigration officers knew about this authority and chose to ignore it.

Ventura in reliance on its own detainer. *Id.* The district court determined that the detention was pretextual and violated the Bail Reform Act. *Ventura*, 96 F.4th at 498–501. The Second Circuit reversed, finding that Ventura could not prevail on "a claim that ICE acted pretextually in detaining" him unless there was "evidence that the detention served the criminal prosecution, not removal." *Id.* at 501. The "clearest examples of pretextual immigration detention," the court explained, are cases in which the "immigration proceedings come to a standstill following detention" or "where the logistics involved in the immigration detention make it difficult to afford defendants the rights to which they are entitled in criminal cases." *Id.* at 501–02.

Augustin has "not present[ed] direct evidence that could support a factual finding of pretext or bad faith." *Id.* at 503. Augustin's immigration proceedings were not stalled when HSI agents questioned him; on the contrary, the proceedings had just been initiated. (*See* ECF No. 171-1 (Gov. Ex. 1).) Nor were there active criminal cases against Augustin when ICE agents arrested him; he had already been convicted for the 2021 state law offenses. (*Id.* at 4.) Indeed, federal prosecutors did not charge Augustin in this case until May 2024, more than two years after an immigration judge terminated his removal proceedings. (ECF No. 171 at 42.) In short, there is no evidence that the ICE arrest and detention served this criminal prosecution rather than his removal proceedings.[17]

### b.    Fifth Amendment

Augustin also argues that he did not validly waive his constitutional rights before the HSI officers spoke to him. (ECF No. 159 at 11–12.)[18] As explained above, a defendant's waiver of his constitutional rights must be both voluntary and knowing, *United States v. Sultanov*, 742 F.

---

[17] The Court does not address the issue of attenuation because the arrest was lawful. (*See* ECF No. 160 at 8–10; ECF No. 171 at 43–44.)

[18] The parties agree that the interrogation was custodial. *See Shatzer*, 559 U.S. at 103.

Supp. 3d 258, 301 (E.D.N.Y. 2024), which the government must prove "by a preponderance of the evidence," *Berghuis*, 560 U.S. at 384. A court evaluating a Fifth Amendment waiver considers the defendant's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). Augustin maintains that he did not "meaningfully understand or knowingly and voluntarily waive" his constitutional rights because "he was raised in Haiti until he was a teenager and English is not his first language," and because "the prospect of an ICE arrest and deportation [was] coercive, even to an educated adult." (ECF No. 159 at 13.)

To the extent that Augustin argues that his waiver had to be in writing, he is wrong. The "failure to sign a waiver form does not preclude a finding of waiver." *United States v. Figaro*, 568 F. Supp. 3d 459, 467 (S.D.N.Y. 2021). Indeed, "oral statement of waiver . . . is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Tallio's handwritten notes and the investigation report reflect that that he advised Augustin of his rights before the officers questioned him, and that Augustin verbally acknowledge and waived those rights. (ECF No. 160-1 at 3 (Augustin Ex. 1); ECF No. 172-6 at 2 (Gov. Ex. 6).)

Augustin claims that the waiver was not knowing and voluntary because he was "[y]oung, alone, [and] surrounded by three to four law enforcement officers threatening him with deportation," which made the setting "inherently coercive." (ECF No. 159 at 12–13.) Even assuming that were the case, however, "full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *O'Brien*, 926 F.3d at 73 (quoting *Berghuis*, 560 U.S. at 382); *see also Moran v. Burbine*, 475 US 412, 425 (1986) ("The purpose of the Miranda warnings . . . is to dissipate the

18

compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights.").

Augustin seems to argue that the interview was inherently coercive because of the possibility that he could be deported. But the potential consequences of an investigation, no matter how serious, do not render an otherwise valid interrogation unfairly coercive. The voluntariness inquiry "depend[s] on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly v. Colorado*, 479 U.S. 157, 170 (1986) (noting that invalidating a waiver "whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police" would "cut . . . [*Miranda*] completely loose from its own explicitly stated rationale"). Augustin does not allege that the officers employed intimidation, coercion, deception, or any other misconduct that would make Augustin's waiver anything but "the product of a free and deliberate choice." *See United States v. Plugh*, 648 F.3d 118, 127–28 (2d Cir. 2011) (finding a waiver voluntary where the defendant did "not claim that the officers threatened him or that he was intimidated in any way . . . [and] there [was] no evidence the defendant was subject to any type of coercion by [the agents]" (citation omitted)). Indeed, Augustin was not held for a particularly long time, the questioning was not "repeated and prolonged," and the officers did not use "physical punishment such as deprivation of food or sleep." *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987); *see also United States v. Rubio*, 709 F.2d 146, 153 (2d Cir. 1983) (affirming finding of voluntary waiver where "there was no credible evidence that [the defendant] was coerced into making any statements through physical or mental abuse, or that he was subjected to protracted

19

interrogation" (citation omitted)). Accordingly, the government has shown by a preponderance that the waiver was voluntary.[19]

Equally unpersuasive is Augustin's argument that "[t]here is no indication in this record that . . . [he] had any capacity at the time to read and comprehend his rights in English." (ECF No. 159 at 13.) Notably, Augustin did not submit a sworn statement that he cannot read or understand English. In any event, "it is well settled in the Second Circuit that the existence of limitations on English language skills does not preclude a defendant from knowingly and voluntarily waiving his or her *Miranda* rights," and "fluency in English is not a prerequisite to waiving *Miranda* rights in English" *United States v. Lopez*, No. 20-CR-95, 2025 WL 1088129, at *5 (D. Conn. Apr. 11, 2025) (citations omitted). Even though English is not Augustin's first language, the record establishes that he spoke and understood English; in his plea agreement to the state firearms charge in 2021, he confirmed in writing that he could "read, write and understand the English language," and that he attended school through the 12th grade. (ECF No. 171-12 (Gov. Ex. 12).) Moreover, he spoke English during the December 14, 2021 interview; the HSI agent's handwritten notes include full sentence quotes of what Augustin said, without any suggestion that Augustin struggled to understand or speak English. (ECF No. 172-6 (Gov. Ex. 6)); *see also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (affirming district court finding of defendants' knowing and voluntary waiver where defendants "ha[d] a reasonably good command of the English language"); *United States v. Norrie*, No. 11-CR-94,

---

[19] Augustin cites the same factors as proof that the statements he made after the waiver were not voluntary. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry.") "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Id.* (citation omitted). The Court rejects this claim for the same reason it rejects his claim about the voluntariness of his waiver.

2013 WL 1285864, at *24 (D. Vt. Mar. 26, 2013) ("[T]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver.").

Augustin also argues that while he "had been arrested before . . . he had no prior experience with . . . [the] immigration detention system." (ECF No. 159 at 13.)  However, he offers no basis for treating immigration detention as unique; as Augustin concedes, his prior Pennsylvania arrests necessarily exposed him to adversarial aspects of the criminal justice system.  *See Sultanov*, 742 F. Supp. 3d at 306 ("Courts . . . confronted with a language-barrier based waiver challenge have identified additional relevant factors, including . . . whether the defendant had prior experience with the criminal justice system." (citations omitted)); *Ruggles*, 70 F.3d at 265 (noting that the defendant was "familiar with police questioning" and with his Fifth Amendment rights because of his "extensive criminal record, including convictions for eleven prior offenses").  Nor does Augustin's relative youth render his waiver involuntary.  *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (holding that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved"); *Norrie*, 2013 WL 1285864, at *19 (finding the twenty-two-year-old defendant's waiver voluntary because "[h]e was an adult with considerable experience with police interrogation and the criminal justice system").  Accordingly, the government has shown that Augustin validly waived his Fifth Amendment rights.

c.    **Suppression Hearing**

Augustin is not entitled to an evidentiary hearing on his claims.  To warrant a hearing on a suppression motion, a defendant must establish a disputed factual issue through "sworn factual allegations from an individual with personal knowledge."  *United States v. Townsend*, No. 15-CR-653, 2016 WL 3562055, at *2 (E.D.N.Y. June 23, 2016) (collecting cases); *see also, e.g.*, *United States v. Harun*, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) ("It is well-settled that a

hearing is not required if a defendant fails to support his factual allegations with an affidavit from a witness with personal knowledge.").

As explained above, Augustin did not submit sworn allegations about the circumstances of the interrogation. Rather he alleges only that "there is no evidentiary proof that in fact Miranda warnings were read to Bradley [Augustin]; no proof he understood them if they were, much less proof that he voluntarily raised them." (ECF No. 159 at 8–9.) His allegations about his arrest are similarly deficient. The evidence in the record refutes Augustin's claims (ECF No. 160-1 at 3 (Augustin Ex. 1); ECF No. 172-6 at 1 (Gov. Ex. 6)), and his unsubstantiated allegations are insufficient to create a factual issue requiring a hearing.[20]

## II.    Rick Jasmin

Jasmin seeks suppression of information from his social media accounts and cellphones, which were seized pursuant to the December 2020, January 2021, March 2021, and April 2021 search warrants. He also moves to suppress the statements he made during his March 25, 2021 interview with law enforcement. In the alternative, he seeks a *Franks* hearing.

### a.    Social Media Warrant

On December 28, 2020, Judge Pollak signed search warrants authorizing the government to search Subject Account-13 and Subject Account-15 — Jasmin's Facebook and Instagram accounts — for "evidence, fruits, and instrumentalities" of violations of certain federal offenses. (ECF No. 162-2 at 7, 15 (Jasmin Ex. A).) The warrants permitted searches only for a particular period: for Subject Account-13, from December 1, 2018 through December 28, 2020 and for

---

[20] The fact that Augustin "is unable to recall whether and to what extent he was given or understood his rights during the December 14, 2021 apprehension," (ECF No. 159 at 9 n. 4), does not create a factual dispute justifying a suppression hearing, *see O'Brien*, 926 F.3d at 74 (finding waiver and ensuing statements voluntary where the defendant did not remember receiving warnings).

Subject Account-15, from March 3, 2019 through December 28, 2020.  (*Id.* at 4–7, 12–15; *see also* ECF No. 172 at 23.)

Jasmin argues that the December 2020 warrant was not supported by probable cause. (ECF No. 162 at 12–14.)  According to Jasmin, Grzelak suggested in his supporting affidavit that Jasmin "was not affiliated with the Hyena Crips" because Grzelak stated that Jasmin was not a party to the June 6, 2020 Facebook audio call in which participants discussed the Hyena Crips' activities and drug sales; Jasmin also cites that statement that a gang member wanted to kill Jasmin because he was "not gang."  (*Id.* at 13.)  Jasmin also asserts that Grzelak misrepresented what were otherwise innocuous postings — including a "common emoji," "quoted and self-written rap lyrics," a game with criminal characters, and photos of firearms from an online retailer — as evidence of "criminal activity."  (*Id.* at 13–14.)

Jasmin also claims that the warrant was overbroad.  (*Id.* at 14–16.)  He argues that the "enumeration of sixteen broad categories of information does not limit the scope of the warrant; rather, it encompasses nearly all the imaginable data that can be gleaned from a social media account."  (*Id.* at 15.)  Jasmin contends that the time limitation "hardly prevented the government from sifting through 'almost every detail' of . . . Jasmin's "digital life."  (*Id.*)

The government responds that the December 2020 warrant was supported by probable cause because publicly available images on Subject Accounts-13 and -15 "set forth a basis to believe that Jasmin was the owner of [those] accounts," and Grzelak's affidavit described "the means[,] methods, [and] purpose of the Hyena Crips," as well as other posts and images connecting Jasmin to the gang, such as the "bluish/purple face emoji with horns" and "unique" hand signs.  (ECF No. 171 at 49.)  According to the government, when Jasmin posted rap lyrics, cartoons, or games, he "adopted the content as his own," and "endors[ed] it by adding the purple

emoji with horns." (*Id.* at 50.)  The government also argues that the fact that a gang member wanted to kill Jasmin does not affect probable cause because some gang members "suspected him of cooperating with law enforcement" and targeted him for that reason.  (*Id.*)

The government denies that the December 2020 warrant was overbroad; it "outlined specific categories of information to be disclosed by the provider and limited certain of that information to relevant date ranges." (*Id.* at 56.)  The warrant was "further limited by 'reference to particular offenses and the use of an illustrative list.'" (*Id.* at 57 (quoting *United States v. Messalas*, No. 17-CR-339, 2020 WL 4003604, at *5 (E.D.N.Y. July 14, 2020)).)  The government asserts that Jasmin "confuses the concepts of search and seizure," and that "[c]ourts in this Circuit routinely uphold warrants to search the various features of an electronic devices or accounts when there is probable cause to believe the device or account contains evidence of a crime." (*Id.* at 58–59 (collecting cases).)

Probable cause is "'a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Gates,* 462 U.S. at 232).  "In evaluating probable cause in any given case, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (citations and internal quotation marks omitted).  "[A] court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.'" *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007)).

Judge Pollack rightly determined that there was probable cause to issue the December 2020 warrant for Subject Accounts-13 and -15.  In his supporting affidavit, Grzelak "described the means and methods" and "purpose" of the Hyena Crips, as well as that gang members identified themselves by certain emojis and the hand signs.  (ECF No. 171 at 49.)  Jasmin posted these emojis and hand signs on his Facebook and Instagram accounts.  (ECF No. 162-2 at 56, 61 (Jasmin Ex. A).)  Moreover, Grzelak detailed Jasmin's social media posts that he was born to be a "gang leader" and "weapons dealer," and his posts about robbery, promoting violence, and shooting someone in the head.  (*Id.* at 49–50.)  Based on these facts, Judge Pollak made the "practical, common-sense decision" that there was "a fair probability that . . . evidence of a crime will be found in" the Subject Accounts-13 and -15.  *See Raymonda*, 780 F.3d at 113.  That decision is entitled to "considerable deference." *Clark*, 638 F.3d at 93 (citation omitted).

Citing *United States v. Jordan*, 714 F. Supp. 3d 158 (E.D.N.Y. 2024), Jasmin maintains that the affidavit did not establish probable cause, because his social media posts were just rap lyrics, innocuous cartoon images, and games.  In *Jordan,* however, the court was not determining whether a search warrant was supported by probable cause — in other words, whether the supporting affidavit established a "fair probability" that evidence of a crime would be found in the place to be searched.  *See Raymonda*, 780 F.3d at 113.  Rather, the court made an evidentiary ruling precluding the government from introducing Jordan's own rap lyrics.  *Jordan*, 714 F. Supp. 3d 162–67 (excluding rap lyrics on Federal Rule of Evidence 403 grounds).

In any event, there was more in Grzelak's affidavit than rap lyrics and the autogenerated "gang leader" and "weapons dealer" Facebook posts.  Grzelak identified images associated with the Hyena Crips, and messages that discussed and promoted violent crime.  (ECF No. 162-2 at 56, 58–59, 61 (Jasmin Ex. A).)  Moreover, Jasmin posted and endorsed those images, which was

a factor in the probable cause determination.  (ECF No. 171 at 50.)  Finally, the fact that Hyena Crips members targeted Jasmin for violence does not undermine Judge Pollak's probable cause determination.  (*See* ECF No. 179 at 8–9.)

As the Court explained in its February 27, 2025 order denying co-defendant Martial H. Amilcar's motion to suppress, the December 2020 warrant was not overbroad.  (ECF No. 144.) Observing that "[c]ourts in this Circuit have upheld social media warrants like the warrant at issue here," the Court found that "'[i]t is well-established that a search warrant can properly permit the [g]overnment to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the government.'"  (*Id.* at 17 (quoting *United States v. Liburd*, No. 17-CR-296, 2018 WL 2709199, at *8 (E.D.N.Y. June 5, 2018).)  The December 2020 warrant "was sufficiently particularized and limited to relevant time periods" as to Jasmin's accounts.  (*Id.* at 18.)

### b.    LG Phone

Jasmin also moves to suppress evidence recovered pursuant to a warrant for his LG phone.  He says that the search warrant affidavit did not establish probable cause because it relied "on generalized assertions about gang activity that fail to establish the "required nexus between the items sought and the 'particular place' to be searched.'"  (ECF No. 162 at 22 (quoting *Clark*, 638 F.3d at 94).)  In Jasmin's view, Grzelak's supporting affidavit "largely rel[ies]" on the "assertion that people in gangs 'often' communicate, use social media, and take pictures on their cellphones."  (*Id.* at 23.)  Citing *United States v. Silva*, No. 22-CR-347, 2024 WL 3488305 (S.D.N.Y. July 19, 2024), Jasmin argues that "evidence that a defendant has engaged in gang-related activity is not sufficient, standing alone, to demonstrate" that evidence of a crime will be found on that cellphone.  (ECF No. 162 at 23 (quoting *Silva*, 2024 WL

3488305 at *16).)  According to Jasmin, the affidavit "contains no claims" that Jasmin used the LG Phone "to communicate with Hyena Crips members or that he used the phone at or around the time of the May 23 shooting;" rather, the affidavit "offers little more than false claims about Mr. Jasmin's social media use," and wrongly interprets "quotation[s] of song lyrics" and "stock images" of guns as bragging.  (*Id.* at 23–24.)  Jasmin also says that the Facebook posts in which Jasmin and other unidentified individuals discussed the Doe shooting cannot support probable cause because they were made on December 28, 2020, 26 days after the police seized the LG Phone, and the affidavit "does not claim that the LG Phone is an internet-enabled cell phone capable of making posts to social media."  (*Id.* at 24.)

The government responds that Grzelak's affidavit "incorporated factual allegations in the Social Media Affidavit . . . and also reflected that Jasmin shot someone in the face during the May 2020 Shooting with a gun that he retrieved from a trap house run by the Gang," which was corroborated by the December 28, 2020 Facebook posts.  (ECF No. 171 at 51.)  The government further contends that *Silva* is distinguishable because it "provided 'case specific evidence' of Jasmin's membership" in the gang and "included information tying [Jasmin's] statements on social media to the use of an electronic device."  (*Id.* at 51–52.)

The Second Circuit reversed *Silva*, on which Jasmin relies, on July 24, 2025, holding that "a search warrant does not require probable cause of the *use* of the property in furtherance of criminal conduct, so long as there is probable cause that the location to be searched contains relevant evidence of the criminal conduct."  *United States v. Silva*, No. 24-2180, 2025 WL 2078339, at *4 (2d Cir. July 24, 2025) (emphasis in original).  The court also emphasized that "a law-enforcement affiant's claim to expertise may support a probable cause determination where

it is combined with enough other specific, factual allegations that tend to link the alleged criminal conduct to the place to be searched." *Id.*

Judged by these standards, Judge Bulsara's decision that there was probable cause to search the LG Phone was clearly correct. Grzelak's affidavit incorporated the information from the December 2020 social media warrant (ECF No. 162-4 at 10 (Jasmin Ex. C)), and described evidence of Jasmin's "membership and criminal activity" with the Hyena Crips, as well as social media messages and videos showing that Jasmin shot John Doe #1 (*id.* at 12–13). The fact that the Facebook post and video were uploaded after law enforcement seized the LG phone is irrelevant in these circumstances. The upshot of the posts is that Jasmin shot John Doe #1 and wanted to silence a witness to that shooting. (*Id.* at 15.) Jasmin was arrested for shooting John Doe #1, and police seized the LG Phone when they arrested Jasmin. (*Id.* at 14.) Judge Bulsara's conclusion that there was "a fair probability that . . . evidence of a crime will be found in" the LG Phone was reasonable. *See Raymonda*, 780 F.3d at 113.

### c.    **Samsung Phone 1**

#### i.    *Unlawful Seizure*

As explained above, another one of Jasmin phones — Samsung Phone 1 — was seized pursuant to a grand jury subpoena issued to Kings County Hospital and then searched pursuant to a search warrant. Jasmin seeks suppression of the phone and its contents because he "did not forfeit his possessory interest in his cellphone when he was taken to the hospital," (ECF No. 162 at 18–21), and argues that the seizure was "'*per se* unreasonable' under the Fourth Amendment, because there was no warrant for the seizure (ECF No. 179 at 4 (quoting *United States v. Place*, 462 U.S. 696, 701 (1983))). Jasmin maintains that this "warrantless seizure . . . cannot be excused" because "no exception justifying warrantless seizure applies." (ECF No. 162 at 20.) Further, Jasmin contends that *Carpenter v. United States*, 585 U.S. 296 (2018) holds that "a

28

warrant—as opposed to a subpoena—is required where a suspect has a legitimate privacy interest in property held by a third party," (ECF No. 179 at 5).

The parties agree that Jasmin had a possessory interest in Samsung Phone 1 while he was in Kings County Hospital. The issue is whether seizing the phone pursuant to a grand jury subpoena violated the Fourth Amendment. As explained below, the Court denies suppression on this ground.

"A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it." *United States v. Dionisio*, 410 U.S. 1, 15 (1973). This includes the use of document subpoenas, although a grand jury "may not issue a subpoena so broad as to impinge unreasonably on legitimate fourth amendment rights." *In re Eight Grand Jury Subpoenae Duces Tecum*, 701 F. Supp. 53, 55 (S.D.N.Y. 1988); *see also Dionisio*, 410 U.S. at 11 ("The Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms 'to be regarded as reasonable.'" (citation omitted)). "[A] grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991).

In *United States v. Barr*, 605 F. Supp. 114 (S.D.N.Y. 1985), the government served a grand jury subpoena on a third party to get Barr's mail. The third party "complied with the subpoena immediately;" a week later, the government "secured a search warrant and opened the mail." *Id.* at 116. In denying Barr's motion to suppress, the court observed that "a subpoena which compels production of evidence is generally not considered to be a 'seizure' within the meaning of the Constitution." *Id.* The court held that if a defendant "demonstrate[s] a

29

reasonable expectation of privacy in the [items] subpoenaed," the court then determines "the level of compulsion present when the subpoena . . . is served." *Id.* at 117.

There is "no bright line rule [to] determine[] when a subpoena infringes upon fourth amendment rights," and courts must examine "the facts of each particular case." *Id.* Among the "guiding principles" for courts are the "circumstances [under which] the person on whom process is served consents to the release of the items" and whether "government agents improperly impinge on the defendant's right to contest the subpoena's validity or a court's authority to quash" it. *Id.* at 118. "[N]otice of the subpoena is related to the opportunity to challenge [it]," although "a mere lack of notice, standing alone, does not establish a violation." *Id.*

The court agreed that Barr had a "legitimate privacy expectation" in his mail, but found that the government did not violate his Fourth Amendment rights because there was no evidence "that [the third-party's] compliance with the subpoena . . . was by other than voluntary consent," or that "the agents who served the subpoena . . . coerce[d] compliance by force or threats or overstep[ped] their legal authority." *Id* at 119. And while "Barr did not have notice of the subpoena" because he was incarcerated, "a motion to quash . . . would not have been successful. *Id.* Finally, the court noted that the subpoena "was not overly broad," that Barr had opportunities — including his motion to suppress — to "raise any alleged infirmities in the subpoena process," and that the party holding his mail "was free to consult counsel or move to quash the subpoena in Barr's absence." *Id.*

As noted above, there is no dispute that Jasmin had a legitimate privacy interest in the Samsung Phone 1. *See Riley v. California*, 573 U.S. 373, 386 (2014) (recognizing that cellphones "place vast quantities of personal information literally in the hands of individuals"

and holding that law enforcement "must generally secure a warrant before conducting such a search" of them).  However, nothing in the record suggests that law enforcement exerted an undue "level of compulsion" on Kings County Hospital in connection with the subpoena.  *See Barr*, 605 F. Supp. at 117.  Like the third party in *Barr*, Kings County Hospital complied with the subpoena without delay and did not move to quash it.  (ECF No. 162 at 17; ECF No. 162-2 at 19 (Jasmin Ex. B); ECF No. 171 at 25; ECF No. 171-11 (Gov. Ex. 11).)  While Jasmin was not notified that law enforcement used a grand jury subpoena to get his phone, he knew that the police had the phone, because they told him so.  (ECF No. 163-6 at 3 (Jasmin Ex. E).)  Finally, Jasmin had the opportunity to challenge the taking of his phone; he was appointed counsel shortly after the phone was taken, and is challenging that taking in this motion.

In *Carpenter v. United States, supra,* the Supreme Court held that law enforcement must get a search warrant for historical cell phone location data, unless there are exigent circumstances.  585 U.S. at 316 ("The Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment."); *see also United States v. Nelson*, No. 20-CR-353, 2023 WL 358421, at *3 (E.D.N.Y. Jan. 23, 2023) (noting that *Carpenter* "expressed its concern with warrantless searches" and denying a motion to suppress where "law enforcement followed the Supreme Court's overriding directive for searches directed at information contained on or related to the use of a cell phone: 'get a warrant'" (citation omitted)).  But that holding does not require suppression of the cell phone in this case, because of the nature of the evidence seized.  In *Carpenter*, the seizure was the equivalent of a search, because the cellphone data was self-evident.  585 U.S. at 311–13 ("Mapping a cell phone's location . . . provides an all-encompassing record of the holder's whereabouts . . . With just the click of a button, the Government can access each carrier's deep repository of historical location

information at practically no expense.").  In other words, the cell location data was not stored in anything; the government could see what it was just by seizing it.

Here, on the other hand, law enforcement could not tell what was in the cell phone simply by taking possession of it.  Of course, if they got access to its contents without a warrant, the contents would almost certainly be suppressed.  But they did get a warrant, which was supported by probable cause.

Even if the use of a grand jury subpoena violated the Fourth Amendment, the search of the phone was sufficiently attenuated from the seizure.  "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).  The Court considers three factors to determine whether the search is attenuated from the seizure: (1) the "'temporal proximity' between the unconstitutional conduct and the discovery of evidence;" (2) "'the presence of intervening circumstances;'" and (3) "'the purpose and flagrancy of the official misconduct.'"  *Id.* at 239 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

The Court begins with the "intervening circumstances" factor, which in the Court's view, is the most salient: the government applied for and got a search warrant before it examined the phone.  Because the government did so, "[n]one of the information on which the warrant was secured was derived from or related in any way to" the government's use of the grand jury subpoena.  *Segura v. United States*, 468 U.S. 796, 814 (1984).  As for temporal proximity, the government applied for and got a search warrant for the phone within a reasonable time — two

32

days.  Finally, to the extent that the government's use of a grand jury subpoena was misconduct, it was not flagrant; a grand jury subpoena is a lawful process and using one in these circumstances was not "purposeful or flagrant" misconduct that "is most in need of deterrence." *Strieff*, 579 U.S. at 241.[21]  Accordingly, suppression is denied on this ground.

### ii.    Probable Cause

Jasmin asserts in any event that there was no probable cause for the warrant, because the supporting affidavit was "largely based" on Jasmin's Facebook and Instagram "photographs, videos, and messages indicating that [he] sold controlled substances and possessed firearms." (ECF No. 162 at 20.)  Because this supporting evidence "derive[s] from the unlawful search of Mr. Jasmin's social media accounts and the LG Phone," anything taken from Samsung Phone 1 is the "fruit of the poisonous tree" and must be suppressed.  (*Id.* at 20–21 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).)

As explained above, the search warrants for the social media accounts and the LG Phone were supported by probable cause, information which was incorporated into Grzelak's affidavit. (ECF No. 162-2 at 13, 15–17 (Jasmin Ex. B).)  Moreover, the affidavit identified specific social media content that Jasmin posted on the day he was shot — including the photo of an AR-15 with the caption "need that," and the post stating that he would "fire on" people who go near his home — and in the days leading up to the shooting.  (*Id.* at 18, 20–21.)  Accordingly, Judge Pollak could "make a practical, common-sense decision . . . [that] there [was] a fair probability

---

[21] Jasmin is not entitled to an evidentiary hearing on his claims.  (ECF No. 179 at 4–7.)  As explained above, a defendant is not entitled to an evidentiary hearing unless he submits "sworn factual allegations from an individual with personal knowledge" that create a factual dispute.  *Townsend*, 2016 WL 3562055, at *2.  Jasmin's affidavit does not raise a factual dispute about the grand jury subpoena.  (*See* ECF No. 163-6 (Jasmin Ex. E).)

that . . . evidence of a crime" would be found in Samsung Phone 1.  *Raymonda*, 780 F.3d at 113 (citations and internal quotation marks omitted).

### d.    Samsung Phones 2 and 3

Jasmin argues that the "probable cause affidavit" for the April 2021 warrant "suffers from similar defects" as the prior warrants.  (ECF No. 162 at 25.)  He asserts that "[n]o individualized claims link Samsung Phone 2 to the alleged criminal activity," and that "while it may be fair to infer that Mr. Jasmin used [Samsung Phone 3] to post to social media in violation of" his bail conditions, his use of the phone was not connected to the crimes the government was investigating.  (*Id.*)

These arguments are not persuasive, for the reasons discussed above.  Like the supporting affidavits for the social media, LG Phone, and Samsung Phone 1 warrants, Grzelak included the same information in the Samsung Phones 2 and 3 affidavits: Jasmin's posts that showed his connection to the Hyena Crips and the gang's criminal activities.  (ECF No. 162-5 at 15–25 (Jasmin Ex. D).)  Moreover, the affidavit identifies additional specific social media posts, including not only the social media posts enumerated in the affidavit for Samsung Phone 1, but also the social media posts that Jasmin made between April 6 and 8, 2021, in violation of his bail conditions.  (*Id.* at 22–23, 25–27.)  Thus, the supporting affidavit established "a fair probability that . . . evidence of a crime" would be found in Samsung Phones 2 and 3.  *Raymonda*, 780 F.3d at 113 (citations and internal quotation marks omitted).

### e.    March 2021 Statements

Jasmin asks the Court to suppress his statements to officers on March 25, 2021, at Kings County Hospital because he was in custody and not advised of his constitutional rights.  (ECF No. 162 at 27–28.)  Although he concedes that he "was not under formal arrest while in the hospital, he understood himself to be restrained such that he was functionally subject to custodial

34

interrogation." (*Id.* at 28.)  In addition, he was ██████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ (ECF

No. 163 at 28.)

The government responds that the "totality of the circumstances indicate that Jasmin was neither interrogated nor in custody, and, as such, *Miranda* warnings were not required."  (ECF No. 171 at 62–63.)  Jasmin "willingly spoke with law enforcement agents about his victimization and the facts surrounding" being shot, made "largely self-serving statements," and, while he was medicated, he "was lucid and thus able to provide details on a range of topics, which a person who could not 'think straight' would not have been able to do."  (*Id.* at 63.)  Moreover, Jasmin was "not handcuffed, shackled or intimidated by the display of firearms," and terminated an earlier interview at Bellevue Hospital "on his own terms" — meaning he "knew he was neither in custody nor intimidated."  (*Id.* at 63–64.)

"Whether an individual is 'in custody' . . . is determined by ascertaining whether that individual is 'subjected to restraints comparable to those associated with a formal arrest.'" *Georgison*, 588 F.3d at 155 (citations omitted).  "The ultimate question is 'how a reasonable man in the suspect's position would have understood his situation.'"  *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984)).  In reaching this determination, "[t]wo discrete inquiries are essential: (1) the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave."  *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004).  Relevant circumstances include "the interrogation's duration; its location . . . ; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they

were drawn; whether officers told the suspect he was free to leave or under suspicion . . . ; [and] a juvenile suspect's age." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (citations omitted).

Jasmin's interview was not custodial. When the police spoke to him, they were investigating a shooting crime of which he was the victim. A critical part of that investigation was interviewing Jasmin to find out who shot him, and the notes of the interview confirm that that this was the subject of the interview. (ECF No. 172-9 at 3–5 (Gov. Ex. 9).) The fact that Jasmin could not leave the room because he was hospitalized does not mean that he was in custody. *United States v. Parker*, 116 F. Supp. 3d 159, 171 (W.D.N.Y. 2015) ("[S]everal circuits have concluded that *Miranda* custody is not established merely because an interview occurs in a hospital where a defendant is receiving medical treatment." (collecting cases)). Indeed, the interview report and notes reflect that the majority of the conversation revolved around the shooting, which bolsters the government's assertion that the officers "interviewed [Jasmin] as a victim of the shooting." (ECF No. 171 at 19.) The officers did not place him under arrest, handcuff him, or display their guns. Nor is there any evidence that Jasmin refused to speak with them; according to the investigation notes, he "agreed to speak with investigators." (ECF No. 172-9 at 3 (Gov. Ex. 9).) Indeed, just four days earlier at Bellevue Hospital, Jasmin also spoke to the officers about the shooting, an interview he does not challenge and which he ended. (ECF No. 171 at 19; ECF No. 172-8 at 3 (Gov. Ex. 8).) No reasonable person in these circumstances would have thought he was in custody. Jasmin's motion to suppress his statements is therefore denied.

Jasmin argues that "at the very least, [the Court should] hold a hearing to decide the material factual disputes raised by" his affidavit. (ECF No. 179 at 13.) In that affidavit, Jasmin

asserts that ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

(ECF No. 162-6 at 3 (Jasmin Ex. E)), which were raised in the March 21, 2021 interview that Jasmin does not challenge, (ECF No. 172-8 at 3 (Gov. Ex. 8).)  Nothing in the affidavit raises a dispute about the facts of the March 25, 2021, interview, which had none of the hallmarks of a custodial interrogation.  Accordingly, the request for a hearing is denied.

      **f.**    *Franks* **Hearing**

Finally, Jasmin argues that the Court should hold a *Franks* hearing because Grzelak made "misleading assertions about the content of Mr. Jasmin's Facebook and Instagram accounts" in the supporting affidavit for the social media warrant.  (ECF No. 162 at 16.)  The Fourth Amendment "requires that a hearing be held at the defendant's request" if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).  Under *Franks*, the defendant must "show that there were intentional and material misrepresentations or omissions in [the] warrant affidavit."  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  A misrepresentation is intentional if "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth."  *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000) (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)).  To determine materiality, "a court must set aside the falsehoods in the application and determine whether the untainted portions of the application suffice to support a probable cause or necessity finding."  *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (cleaned up).

Jasmin argues that Grzelak "misled the magistrate by omitting key facts about his assertions in the search warrant," particularly that the images identifying Jasmin as a "gang leader" and "weapons dealer" were "cartoon images from a Facebook game," that the "statement about being 'strap[ped]' and 'hitting someone in the 'top' are lyrics from a rap song," and that the photo of firearms was a screenshot from the website of a firearms retailer. (ECF No. 162 at 16.) *Franks* requires "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." 438 U.S. at 171; *see also Rajaratnam*, 719 F.3d at 154 ("[T]he reviewing court must be presented with credible and probative evidence that the omission [or misrepresentation] was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" (citation omitted)). Jasmin does not make those allegations.

Moreover, the posts that Jasmin challenges were not the only basis for the probable cause determination. In addition to general information about the Hyena Crips and its violent activities, Grzelak cited the May 23, 2020 text message between Jasmin's co-defendants — "Yo Hyens Tell Jab to Come Back With the Jawn" — which Grzelak explained was a direction to tell Jasmin to come back with the gun; Jasmin shot John Doe #1 minutes later. (ECF No. 162-2 at 39, 57–58 (Jasmin Ex. A).) Grzelak also described the Facebook and Instagram posts containing "repeated display[s]" of the "bluish/purple emoji with horns," which was associated the Hyena Crips, as well as an Instagram photo of Jasmin flashing a hand sign associated with the gang. (*Id.* at 56–57, 61.) These facts were sufficient to support a finding of probable cause. Accordingly, Jasmin's request for a *Franks* hearing is denied.[22]

---

[22] Jasmin suggests that a *Franks* hearing is also warranted for the cellphone warrants, relying on the arguments he made about the social media warrant. (ECF No. 162 at 24 n.5.) The request is denied.

**CONCLUSION**

For these reasons, the defendants' motions are denied.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      August 25, 2025